Maddest, Judge,
concurring in the result:
I agree with the court’s decision, but I think the court’s effort to distinguish the Merchants Club case is not a success. I would overrule that decision.
FINDINGS OP FACT
The Court having considered the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation which was organized under the laws of the State of New York in 1893. Its present location and address is 40 Worth Street, New York, Ñ. Y.
*251 2. During the 1920’s, the plaintiff paid taxes with respect to its members’ dues under revenue statutes similar to section 1710 of the Internal Revenue Code, but received a refund of such taxes in 1929. From then until 1942, the plaintiff was not required to collect taxes on its members’ dues. Beginning in 1942, the plaintiff was again required to pay taxes with respect to its members’ dues. On or about February 26,1945, the plaintiff filed a claim for refund of excise taxes paid on initiation fees and dues of its members for the period December 1942 through December 1944 on the ground that it was not a social club within the meaning of section 1710 of the Internal Revenue Code. That claim was rejected by the Commissioner of Internal Revenue on April 6,1945, but following the decision of this Court in The Merchants Club v. United States, 106 C. Cls. 562, the rejection was withdrawn and the claim allowed on October 31, 1946, on the ground that the plaintiff did not qualify as a social, athletic or sporting club within the meaning of section 1710 of the Internal Revenue Code. After the allowance of that claim, the plaintiff discontinued the collection of taxes from its members.
3. On April 1,1949, the Collector of Internal Revenue for the Second District of New York, acting pursuant to a ruling by the Commissioner of Internal Revenue, notified the plaintiff that the prior ruling as to the plaintiff’s status had been revoked, that it qualified as a social club within the meaning of section 1710 of the Internal Revenue Code, and that it should collect from its members taxes on initiation fees and dues and pay such taxes over to the appropriate collector of internal revenue.
4. Since the receipt of the letter above referred to, the plaintiff has collected taxes on initiation fees and dues from its members and paid such taxes over to the appropriate collector. Taxes paid for the period April 1,1949, through September 30,1949, amounted to $5,905.12 and were paid on the following dates and in the amounts shown:
June 10, 1949_ $289.00
August 3, 1949_ 967.99
August 3, 1949_ 1,759.51
September 22, 1949- 927.30
October 13, 1949_ 818.32
October 28, 1949_1,143.00
*252 5. On November 14, 1949, the plaintiff filed a claim for refund on Form 843 requesting that the taxes paid for the period April 1, 1949, through September 30, 1949, in the amount of $5,905.12 be refunded. As grounds for its claim, the plaintiff stated that it was not a social club or organization within the meaning of section 1710 of the Internal Eevenue Code and that the dues and initiation fees of its members were not subject to tax. In support of its claim the plaintiff filed with the Commissioner a copy of its constitution and bylaws, powers of attorney from certain of its members authorizing the plaintiff to proceed on their behalf and an alphabetical list of the members from whom powers of attorney had been obtained showing the amount of taxes collected from each. Taxes collected from members from whom powers of attorney were obtained and filed amounted to $5,141.25.
6. On October 27, 1950, the Commissioner rejected the plaintiff’s claim for refund on the ground that the plaintiff qualified as a social club within the meaning of section 1710 of the Internal Eevenue Code.
7. In its certificate of incorporation, which was filed in the Office of the Secretary of State, State of New York, on April 13,1893, the business and objects for which the plaintiff was formed were stated as follows:
That the particular business and objects for which the said corporation or club is formed are the social and mutual benefit of the members thereof and to provide for such members a pleasant place of common resort for entertainment.
In its bylaws, which were in effect for the period involved in this proceeding and had been in effect at least since 1944, the purpose of the plaintiff was stated as follows:
The purpose of the Club shall be to establish and maintain quarters and accessories wherein its members, their associates, clients and business friends may obtain their meals and have available private rooms suitable for business conferences.
8. The plaintiff’s bylaws are drafted in the usual form for the government of an organization of this character. They *253 provide for the election of a Board of Governors by the membership and for the election by that Board of a president, vice president, secretary and treasurer. They empower the president to appoint certain committees, designating for each the chairman and vice chairman, and they specify the functions and duties of each officer.
9. Article Y of the bylaws specifies the manner in which members of the Club shall be elected, expelled or suspended. It is there provided that the Board of Governors shall elect all members of the Club. Section 2 of that article provides that:
Any male person of the age of twenty-one years, and of good character, is eligible for membership in the Club.
Section 5 of this article provides that every candidate for membership must be proposed and seconded in proper form by members of the Club and that the name and address of the candidate with the names of his proposer and seconder shall be posted on the bulletin board of the Club for at least ten days prior to the election of such candidate to membership.
Section 6 of this article provides that:
The proceedings of the Board of Governors upon the election of candidates shall be secret and confidential and no record of such proceedings shall be kept except the record that the candidate has been elected or rejected.
No hard and fast qualifications exist for eligibility for membership. There are no restrictions on membership by reason of race, religion, or similar personal characteristics. The members are not chosen on the basis of wealth or social standing. Important factors as to eligibility for membership are whether the applicant has a good reputation and is a presentable sort of person.
10. The Buies and Begulations of the Board of Governors establish the rules and regulations for the general conduct of the Club. They provide for the order of business and the appointment of standing and special committees. Such rules and regulations further provide for appointment of a membership committee—
To consist of five members who shall furnish applications to and pass upon all candidates for admission. *254 They must inquire into the qualifications of each candidate for membership. All candidates for resident membership must be known or introduced to at least three members of the Committee.
11. The House Eules of the Club provide in part in substance that any resident of the State of New York residing within a radius of fifty miles of the Club may be a guest only twice in thirty days unless special permission is otherwise granted; that on application of a member the president or secretary, subject to the approval of the house committee, shall issue cards of admission to guests entitling the holders of such cards to the privileges of the Club for a two-week period, including the right to introduce guests; that no member may have more than two cards outstanding at one time, and that this guest privilege shall not be extended to the same guests oftener than once in three months; that the names and residences of guests, except ladies, and the names of the introducing members must be recorded; that private dining rooms may be assigned to parties of not less than four persons at a charge to be fixed by the house committee; that the use of the “Tap Boom” is restricted to men; and that “No games of hazard, soliciting of chances, * * * will be permitted in the Club rooms.”
The following standing committees are specified for the Club:
House Committee
Finance Committee
Membership Committee
Entertainment Committee
Affiliations Committee
12. The number of members is not limited by any bylaw or regulation. During the period here involved, the Club had 888 resident members and 200 non-resident members. The admission fee for resident members is $75 and the dues $60 per year. The admission fee for non-resident members is $20 and the dues $20 per year.
13. The plaintiff’s quarters occupy one-half of the fifteenth floor of an office building called the 40 Worth Street Building in New York City. It leases its premises from the owner of the building at an annual rental of $22,000. The Club prem *255 ises consist of a foyer or lobby (which is reached by the elevators serving the building), a lounge, an office, a main dining room, three private dining rooms, a bar or grill (or Tap Boom, as referred to in the House Buies), a kitchen, a coatroom, a men’s washroom, a ladies’ powder room, the manager’s office and a cigar stand. During the luncheon period one elevator is assigned for the exclusive use of the Club.
14. The foyer contains four lounge chairs, one settee, three tables, three reading lamps and a telephone booth.
The main dining room is approximately 115 feet by 35 feet. It has 65 tables and seats about 254 people. The largest private dining room is approximately 36 feet by 17 feet and seats about 32 people. It adjoins and is normally used as part of the main dining room but it can be closed off as a separate room. The other two private dining rooms are approximately 19 feet by 17 feet and seat between 22 and 24 people each. The doors between these rooms can also be opened for the purpose of converting these rooms into one large room.
The bar or grill is approximately 32 feet by 32 feet and contains a bar approximately 20 feet long with a bar rail, one table seating twelve, three tables seating seven each, three tables seating four each, and two tables seating two each. In addition to these seating facilities, there is a leather upholstered wall seat. That room is panelled in hardwood and it is decorated with stag heads. It is for men only and ladies are not permitted therein. When members come to the grill for a drink they can either stand at the bar or sit at one of the tables. Lunches are also served at these tables. Pretzels are served free at the bar. The bar is open from 11 a. m. until 7 p. m., at which time the last bartender goes off duty.
The lounge is a room approximately 36 by 32 feet. It contains six leather davenports and 18 chairs, two writing desks, two large tables, three coffee or side tables, 21 reading lamps, and a console type radio. Available for the members’ use in the lounge are the following newspapers, magazines, and . other periodicals:

*256
Magazine» Newspapers

Textile Industries Daily News Record
Technology Review Journal of Commerce
Rayon & Synthetic Textiles Southern Textile News
Boys Outfitter N. Y. World Telegram
Textile World N. Y. Journal American
Mercantile Guardian
Apparel Manufacturers
Newsweek
Business Week
Time
Fortune
New Yorker
Life
Collier’s
Esquire
Cue
The furnishings of the Club are comfortable but not luxurious. In 1950 the furnishings, equipment and improvements of the Club were appraised at a replacement value, less depreciation, of $147,718.30, of which amount approximately $40,000 was for furniture.
15. The Club has fifty-eight employees grouped as follows:

Duties Hours oí work

Office Manager_9 a. m. to 5 p. m.
Office Clerks (3)_9 a. m. to 5 p. m.
Coatroom Attendant_11 a. m. to 3 p. m.
Porter_8 a. m. to 3 p. m.
Steward and Club Manager-■ 8 a. m. to 4 p. m.
Chef_8 a. m. to 4 p. m.
Cooks (5)_7 a. m. to 3 p. m.
Coffee and Salad Man_7 a. m. to 3 p. m.
Pantrymen and Dishwashers (7)_7 a. m. to 3 p. m.
Checker_11:30 a. m. to 4 p. m.
Dining Room Hostess_8 a. m. to 2 p. m.
Waiters and Waitresses (24)-11 a. m. to 2 p. m.
Waitresses and Table Arrangers (3)-12 m. to 3 p. m.
Bartender — full time_12 m. to 7 p. m.
Bartenders — part time (2)_11 a. m. to 2:30 p. m.
Busboys (5)_11 a. m. to 2 p. m.
One waiter who serves in the dining room from 11 a. m. to 2 p. m. also thereafter assists the full time bartender until 7 p. m. The office manager is paid a salary of $135 per week.
16. The Club is open from 9 a. m. to 7 p. m. on Mondays through Fridays. It is not open on Saturdays, Sundays or *257 holidays, or in the evenings. Luncheon is the only meal served at the Club. The principal use of the Club is during the luncheon hour, when the Club serves an average of between 850 and 360 lunches a day at an average price of between $2.25 and $2.50. The prices charged are lower than most first-class restaurants and clubs in New York. After the luncheon period, a relatively small use is made of the Club by members who come to the Club during the afternoon — particularly from 5 to 7 p. m., when members are served drinks in the grill and lounge. Lunches are served in the main dining room, the private dining room and in the bar or grill, and drinks are served in these same places and in the lounge.
17. The private dining rooms are used nearly every day by various groups for business meetings. These business groups are almost exclusively from the textile trade. These meetings are usually held during the luncheon period. When a member makes application for the use of a private dining room, no inquiry is made by the Club officers as to the intended use thereof. A charge of $5 for the use of each such room is made.
18. The principal use of the bar or grill is during the luncheon period. In addition to drinks, the regular lunch is served in this room and the tables therein are usually occupied at the luncheon period by people having their lunch and, in most cases, also having drinks. One reason for the popularity of this room as a place to have lunch is that during the summer the members may remove their coats while eating therein.
As heretofore stated, drinks from the bar are also served in the main dining room, the private dining rooms, and in the lounge. By far the greater portion of alcoholic beverages consumed on the Club premises takes place in connection with lunch. To a number of members of the Club and businessmen in that area, having a drink before or with lunch is considered as routine as having any other portion of the meal. Service of drinks in the lounge usually occurs when a member comes to the Club during the afternoon and up to 7 p. m. At that time drinks are also served in the bar or grill.
*258 19. The Club has no facilities for the playing of games, either social or athletic. There are no billiard or pool tables, card tables, or other such facilities. No games are played on Club premises. The Club never holds dances, parties, open-house, or similar functions. At Christmas time the Club serves a Christmas luncheon at a fixed price. No ladies are permitted to attend this luncheon. Once each month the Board of Governors holds its meeting at the Club in the evening when dinner is served, which is the only occasion when a meal is served other than during the luncheon period.
20. The Club has no ladies’ dining room. While women are permitted on the Club premises (except in the bar or grill) in the company of a member, members seldom bring their wives or families to the Club.
21. The Club issues membership cards to its members. The Club also has reciprocal relations with other clubs throughout the country. The members are advised of such reciprocal relationships by the following which appears on the reverse side of the membership card:
Members are entitled to exchange courtesies with the following Clubs on presentation of Membership Card:
Quequeehan Club_Fall River, Mass.
The Albany Club_Albany, N. X.
Chamber of Commerce_Nashville, Term.
The Boston City Club_Boston, Mass.
The Duluth Chamber of Commerce_Duluth, Minn.
San Francisco Commercial Club_San Francisco, Calif.
The Arctic Club_ Seattle, Wash.
Dallas Athletic Club_Dallas, Tex.
Downtown Club_Newark, N. J.
Downtown Club of Dallas_Dallas, Tex.
These reciprocal privileges are not used to any large extent by the members of the Club.
22. The treasurer and committees of the Club submit an annual report to the governors’ meeting each year in which report is set forth the income and expenses of the Club for the year and its financial status. That report for the year 1949 showed that the Club had cash balances in savings banks and investments in United States Government Bonds at December 31, 1949, in the total amount of $100,149.80. It *259 also had cash on hand and in bank of $16,252.21, in addition to an amount of $6,020.96 available for capital expenditures. The report further disclosed that 90,404 meals were served, of which 65,705 were served to members and 24,699 served to guests. The report also contained the following statement of operations:

23. The Club is named after Richard Arkwright, the inventor of the spinning frame. Ever since its founding in 1893, the Club has been closely identified with the textile trade. The present quarters of the Club are its third location and all have been in New York City in what is known as the “Worth Street District.” That district is in lower Manhattan, and is an area extending north from Chambers Street to a block south of Canal Street and west from one block east of Broadway to west of Broadway. The Worth Street District is the heart and center of the textile marketing system of the country. Textile manufacturers are scattered throughout the country, but distribution and sales are centered overwhelmingly in the Worth Street District.
24. While the membership of the Club is unlimited and any male person twenty-one years of age or over and of good character may be elected to membership in the Club, without regard to his occupation, interests, or profession, practically all of the Club’s members are either directly in the textile business or have a definite business interest in it. Of the Club’s 888 resident members, 824 are directly in the textile business. Of the Club’s 200 non-resident members, 197 are directly in the textile business. Most of the members not directly in the textile business have close business ties with it. In a few instances individuals who are not connected with the textile industry are members of the Club because of its convenient luncheon facilities, such as five members engaged in the telegraph business who are located across *260 the street from the Club, sis members in the hardware business who formerly belonged to the Hardware Club located in that area and who joined the plaintiff Club when the Hardware Club was dissolved, and a referee of the New York Supreme Court who is located in that area.
25. There is no organization in the selling of textiles which is comparable to such organizations as the New York Stock Exchange, the New York Curb Exchange, or the New York Produce Exchange. There are periodicals which carry everyday notes and lists of prices of the basic cloths that are sold in the market but they do not fill the function, such as might be performed by a marketing exchange, of making a complete report of every transaction and the gradations in price. Information of the latter nature is exchanged by members of the Arkwright Club as they meet informally or in group meetings at the Club. Various groups comprising segments of the textile business meet at the Club regularly. For example, a group of the credit men of a number of large textile houses eat lunch daily at what is called the credit round table. The textile houses represented at this credit table have an annual volume of approximately a billion and a half dollars, and the purpose of this daily group meeting is good fellowship and to exchange information relative to credit problems common to the textile business. Another group composed of men engaged in arranging for the finishing of textiles have lunch regularly together at the “finishers” table. It is considered advantageous to a man in the textile industry to belong to the Arkwright Club because of the opportunities to meet people in the textile industry and keep abreast of what is going on in that industry. Members who move away from the Worth Street District frequently continue their membership in the Club in order to maintain their sources of information relative to the textile business. Non-resident members are largely connected with companies engaged in the manufacturing and finishing of textiles who come to New York occasionally to attend conferences with their New York representatives.
While the predominant interest of the members of the Club has to do with affairs pertaining to the textile industry and, as shown above, many matters of a business nature per *261 taining to that industry are discussed and considered at the Club, there is no club rule which restricts the topics of conversation on the premises and in addition to business matters it is not uncommon for the usual topics of the day to be discussed.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover and its petition is therefore dismissed.